IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| **SHELL OIL COMPANY: SWEPI L.P.,** )<br>f/k/a **SHELL WESTERN E&P, INC.;** )<br>**KINDER MORGAN CO$_2$ COMPANY, L.P.,** )<br>f/k/a **SHELL OIL CO$_2$ COMPANY, LTD.;** )<br>and **CORTEZ PIPELINE COMPANY,** a )<br>partnership, )<br>)<br>      **Petitioners,** )<br>vs. ) | No.   CIV 06-1042 RB/DJS |
| )<br>)<br>**CO$_2$ COMMITTEE, INC.,** )<br>)<br>      **Respondent.** )<br>)<br>)<br>**MOBIL PRODUCING TEXAS AND** )<br>**NEW MEXICO, INC.,** )<br>)<br>      **Petitioner in Intervention,** )<br>)<br>v. )<br>)<br>**CO$_2$ COMMITTEE, INC.,** )<br>)<br>      **Respondent in Intervention.** ) | |

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on Petitioners Shell Oil Company, SWEPI L.P., f/k/a Shell Western E&P, Inc., Kinder Morgan CO$_2$ Company, L.P., f/k/a Shell Oil CO$_2$ Company, Ltd., and Cortez Pipeline Company's Application for Order Confirming Arbitration Award (Doc. 1), filed on October 25, 2006, and Petitioner in Intervention Mobil Producing Texas and New Mexico,

Inc.'s Application in Intervention for Order Confirming Arbitration Award (Doc. 21), filed January 30, 2007. Jurisdiction arises under 28 U.S.C. § 1332 (2000).[1] Having considered the submissions, and being otherwise fully advised, I grant Petitioners' Applications an and confirm the Arbitration Award.

**I.      Background.**

Petitioners Shell Oil Company, Kinder Morgan, and Petitioner in Intervention Mobil (collectively "Petitioners") are current working interest owners in the McElmo Dome Unit ("McElmo Dome"), a significant carbon dioxide deposit located in southwestern Colorado.[2] Petitioner Cortez Pipeline Company owns and operates a five-hundred mile pipeline that transports carbon dioxide extracted from the Unit, through New Mexico, to Texas. Cortez is a general partnership; its partners include, *inter alios*, Petitioners Kinder Morgan and Mobil.

Respondent is a Colorado nonprofit corporation whose members are royalty interest owners, overriding royalty interest owners, and small share working interest owners in McElmo Dome. These individuals were named plaintiffs, or certified settlement class members, in several civil lawsuits filed in the United States District Court for the District of Colorado ("the Colorado litigation").

The Colorado litigation concerned Petitioners' "alleged underpayment of royalty and revenue

---

[1] The Federal Arbitration Act ("FAA" or "the Act") makes certain arbitration agreements enforceable in federal district court, but "does not create any independent federal-question jurisdiction under 28 U.S.C. § 1331 . . . or otherwise." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25 n.32 (1983); 9 U.S.C. §§ 1-16 (2000). Pursuant to 28 U.S.C. § 1332, federal district courts have original jurisdiction to adjudicate civil actions where diversity of citizenship exists and "the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs." 28 U.S.C. § 1332. Here, it is undisputed that the amount-in-controversy exceeds the requisite $75,000 threshold and that "complete diversity" of citizenship exists between the parties. *See Carden v. Arkoma Assoc.*, 494 U.S. 185, 187 (1990) (citing *Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267 (1806)).

[2] Because Petitioner in Intervention Mobil's Application (Doc. 21) is substantively identical to Petitioners' Application (Doc. 1), the Court - for purposes of this Memorandum Opinion and Order - will refer to all the Petitioners collectively ("Petitioners"). Similarly, to ease readability, Respondent $CO_2$ Committee, Inc. will simply be referred to as Respondent, despite the caption's styling.

payments" on carbon dioxide produced in McElmo Dome and transported to Texas oilfields via Petitioner Cortez's pipeline. (Petitioners' Joint Resp. 2.) Cortez "set the tariff by using a methodology based upon the Final Judgment entered in 1941 in *United States v. Atlantic Refining Co.*" ("the *Atlantic Refining* Consent Decree"). (Stipulated Ex. 1 at 2.)

Respondent was formed as part of the parties' settlement ("the Settlement Agreement" or "the Agreement") that resolved the Colorado litigation. Respondent's chief purpose is to oversee compliance obligations brokered in the Settlement Agreement, which was approved by the Honorable Zita L. Weinshienk, United States District Judge for the District of Colorado in May 2002.

Petitioners Kinder Morgan and Mobil make royalty payments to McElmo Dome interest owners. These payments are based on the downstream sales of carbon dioxide from McElmo Dome, less the transportation fee charged by Petitioner Cortez ("Cortez Tariff").

Before the parties' Settlement Agreement became effective, the Cortez Tariff was calculated in accordance with the *Atlantic Refining* Consent Decree. Under the Settlement Agreement, however, the Cortez Tariff must be "calculated in accordance with the Consent Decree Methodology" ("the CDM") described in the Agreement. (Stipulated Ex. 4 at 35, § 4.1.14; *accord* Stipulated Ex. 1 at 8 ("The Settlement Agreement describes the [parties'] agreed upon '[CDM]' for calculation of future tariffs in [its] Exhibit F."); *see* Stipulated Ex. 5.) Sometime after the Settlement Agreement became effective, Respondent learned that: (1) Petitioners were "distributing tax allowances in excess of the 7% cap" on the Cortez Tariff; and (2) Petitioner Cortez was "calculating the Cortez Tariff" to recover a "'carry forward' that existed prior to settlement." (Respondent's Resp. at 7.)

The Settlement Agreement includes a binding arbitration clause. By its terms, all disputes

"arising from or related to" the Settlement Agreement must be submitted to binding arbitration. (Stipulated Ex. 1 [Settlement Agreement] at 63, § 14.1.) Respondent initiated the underlying arbitration proceeding to resolve whether Petitioners' calculation of the Cortez Tariff comports with the Settlement Agreement's CDM.[3] (Respondent's Resp. at 6.)

## II. Procedural Posture.

Respondent initiated the underlying arbitration proceedings on November 28, 2005. (Stipulated Ex. 1 [Panel's Aug. 7, 2006 Op.] 4.) Respondent alleged that Petitioners' accounting practices violated the Settlement Agreement. (*Id.* 4-5.) In June 2006, a five-day arbitration hearing was held in Albuquerque, New Mexico. On August 7, 2006, the Arbitration Panel ("the Panel") issued the Arbitration Award ("the Award"). The Panel unanimously found in Petitioners' favor, on all claims.

On October 25, 2006, Petitioners jointly filed an Application for Order Confirming Arbitration Award (Doc. 1) in this Court; on January 30, 2007, Petitioner Mobil filed an Application in Intervention for Order Confirming Arbitration Award (Doc. 21) (collectively "the Applications"). These pleadings are substantively identical.

## III. Discussion.

Petitioners argue that the Panel's Award should be confirmed and judgment should be entered thereon. Respondent argues that this Court should vacate the Arbitration Award.

### A. Standard of Review.

The Federal Arbitration Act ("FAA" or "the Act") provides, in relevant part, that:

---

[3]As Respondent clarified, "[t]here is no dispute" that Cortez is calculating the Tariff in this manner, the question presented to the arbitration panel was, simply: "whether [Petitioners] [were] entitled to do so" pursuant to the Settlement Agreement's [CDM]." (Respondent's Resp. at 6 n.2.)

> If the parties in their agreement have agreed that a judgment of the court shall be entered upon the award made pursuant to the arbitration, and shall specify the court, then . . . any party to the arbitration may apply to the court so specified for an order confirming the award, and thereupon the court *must* grant such an order unless the award is vacated, modified, or corrected as prescribed in section 10 and 11 of this title.[4]

9 U.S.C. § 9 (emphasis added).

The Court of Appeals for the Tenth Circuit, in reviewing a district court's order (either confirming or vacating an arbitration award), reviews the court's "factual findings for clear error and questions of law *de novo*." *Hollern v. Wachovia Sec., Inc.*, 458 F.3d 1169, 1172 (10th Cir. 2006) (order vacating arbitration award reviewed); *Sheldon v. Vermonty*, 269 F.3d 1202, 1206 (10th Cir. 2001) (order confirming arbitration award reviwed). But, therein, the reviewing court "must nevertheless":

> give extreme deference to the determination of the arbitration panel for *the standard of review of arbitral awards is among the narrowest known to law* . . . . Once an arbitration award is entered, the finality of arbitration weighs heavily in its favor and cannot be upset except under exceptional circumstances.

*Hollern*, 458 F.3d at 1172 (emphasis added) (internal quotation marks and citation omitted).

Accordingly, "[a] district court may vacate an arbitral award only for reasons enumerated in . . . 9 U.S.C. § 10 . . . or for a handful of judicially-created reasons." *Id.* (internal quotation marks and citation omitted). An award may only be vacated if one of these prescribed circumstances applies; otherwise, the award must be confirmed. *See* 9 U.S.C. § 9. These "limited circumstances" are as follows:

---

[4]FAA § 11 pertains to instances in which the district court may "make an order modifying or correcting the award upon the application of any party to the arbitration." Because Respondent seeks to have this Court *vacate*, rather than modify or otherwise correct, the arbitration award, this provision is inapplicable. FAA § 10 governs the Court's disposition of this matter.

> Under § 10 of the FAA, a district court is only permitted to vacate an arbitration award if it finds that: (1) the award was procured by corruption, fraud, or undue means; (2) there was evident partiality or corruption in the arbitrators; (3) the arbitrators were guilty of misconduct in refusing to postpone a hearing, in refusing to hear evidence, or in misbehaving in some other way; or (4) the arbitrators exceeded their powers or imperfectly executed them. 9 U.S.C. § 10(a)(1)-(4). [The Tenth Circuit] ha[s] also recognized a handful of judicially created reasons that a district [court] may rely upon to vacate an arbitration award, and these include violations of public policy, manifest disregard of the law, and denial of a fundamentally fair hearing . . . Outside of these limited circumstances, an arbitration award must be confirmed, and errors in either the arbitrator's factual findings or his interpretations of the law . . . do not justify review or reversal.

*Sheldon*, 269 F.3d at 1206 (internal quotation marks, brackets, and additional citations omitted).

### B. None of the limited circumstances that permit a court to vacate an arbitration award apply; the Arbitration Award must be confirmed.

Respondent alleges that the Panel committed two errors that warrant vacating the Award. First, it alleges that the Panel defied "Colorado law concerning contract interpretation" in construing the Settlement Agreement and, specifically, the CDM.[5] (Respondent's Resp. at 2.) Second, Respondent argues that the Panel "denied [Respondent] a fundamentally fair hearing" by refusing to allow its expert, Dr. Jerome Hass, to testify regarding whether Cortez's claimed "carry forward" was $68 million at the time of settlement.[6] (Respondent's Resp. at 2, 8.)

As an initial matter, the Court notes that neither of Respondent's "arguments include allegations that fraud, corruption, or arbitrator misconduct marred the panel's proceedings." *See*

---

[5]Colorado law governs the instant dispute. (Stipulated Ex. 4 [Settlement Agreement] 60, § 13.19; Respondent's Resp. at 10 n.3; Petitioners' Reply 6.)

[6]The parties agreed to judicial confirmation of the arbitration award. The Settlement Agreement contains an arbitration clause that expressly contemplates judicial confirmation of arbitral awards. The Settlement Agreement states that "judgment upon the [arbitration] award may be entered in *any* court having jurisdiction thereof . . ." (Stipulated Ex. 4 at 64-65, § 14.3 (emphasis added).) For the reasons set forth therein, this Court - by its Memorandum Opinion and Order (Doc. 20), filed January 29, 2007 - determined that venue is proper in the District of New Mexico. *See* 9 U.S.C. § 9 (expressly permitting parties to specify which court will be permitted to enter judgments on future arbitration agreements).

*Dominion Video Satellite, Inc. v. Echostar Satellite L.L.C.*, 430 F.3d 1269, 1276 (10th Cir. 2005). Nor does either argument charge that the Arbitration Award violates public policy. *See id.* Accordingly, Respondent "can only succeed if it shows that the panel acted in manifest disregard of the law or otherwise exceeded its powers," or that it denied Respondent a fundamentally fair hearing. *See id.*

### 1.     The Underlying Arbitration Proceeding.

Before assessing Respondent's arguments presented here, the underlying arbitration proceeding and its outcome must be briefly recounted. Respondent initiated arbitration because it maintained that, in two regards, Petitioner was in breach of the Settlement Agreement. (Stipulated Ex. 1 at 4-5.) First, Respondent claimed that:

> While [Petitioner] Cortez may properly use the cost of federal and state income taxes paid or to be paid by the Cortez partners in setting the tariff and may properly collect such tax allowances, [Respondent] asserts that Cortez may not distribute such tax allowances to its partners without violating the Settlement Agreement.

(Stipulated Ex. 1 at 4.) Second, it alleged that:

> the Settlement Agreement prohibits any tariff that would provide a return to Cortez in excess of 7% of the valuation of Cortez' [sic] property, and that any amount distributed by Cortez in excess of 7% [violates the Settlement Agreement] . . . .
> Specifically, [Respondent] assert[ed] that
> (a)     Tax allowances may not be used in setting the tariff to the extent doing so would cause distributions to exceed 7% of valuation;
> (b)     Carry forwards existing on Cortez' [sic] books at the time of the settlement by reason of Cortez having earned less in prior years than it could distribute according to the 7% limit may not be carried forward and used as a cost in setting tariffs after the settlement; and
> (c)     Alternatively, Cortez his [sic] misapplied the allowable carry forwards, resulting in tariffs in excess of those permitted by the Settlement Agreement.

(*Id.*)

Ultimately, the Panel unanimously rejected both claims raised by Respondent. The Panel concluded that the Settlement Agreement: (1) authorizes Cortez to distribute its "tax allowances to [its] partners" (Stipulated Ex. 3 [Panel's Apr. 24, 2006 Order] 3); (2) does not limit the "amount of such distribution[s]" to 7% of the value of Cortez's property (Stipulated Ex. 1 at 5, 10 ("the Settlement Agreement permits a distribution of 7% *plus* tax allowances" (emphasis added)); and (3) allows Petitioners to "recover pre-settlement carry-forwards in calculating the Cortez Tariff." (Respondent's Resp. at 7; *see* Stipulated Ex. 1 at 5-6, 34.)

### 2. The Instant Dispute: the Arbitration Award Will Be Confirmed.

Respondent asks this Court to set aside the Panel's award on two grounds. For the reasons stated herein, neither of its arguments are persuasive.

### a. The Panel did not blatantly disregard Colorado law pertaining to contract ambiguity and extrinsic evidence.

Respondent first contends that the Panel "blatantly disregarded" the "applicable Colorado rules concerning contract interpretation, ambiguity, and extrinsic evidence." (Respondent's Resp. at 9.) While it concedes the Panel correctly recited Colorado law pertaining to contract ambiguity, Respondent claims that the Panel ignored those principles when it conditionally admitted extrinsic evidence. Specifically, Respondent challenges the Panel's consideration of extrinsic evidence in determining whether the CDM - i.e., the rubric by which the Cortez Tariff is calculated under the Settlement Agreement - was ambiguous as to "both the tax allowance issue and the carry forward issue." (Respondent's Resp. at 9.)

Respondent argues that, contrary to Colorado law, the Panel failed to "make the requisite determination of ambiguity" *before* hearing extrinsic evidence. Respondent also alleges that the Panel

compounded this error by failing "to determine *after* hearing extrinsic evidence [at the June 2006 arbitration hearing] if [the CDM] was ambiguous." (*Id*. 9 (emphasis added).)  Hence, Respondent alleges the Panel blatantly "relied upon extrinsic evidence" without first finding the CDM to be ambiguous. (*Id*.)  Petitioners, conversely, maintain that the Panel complied with applicable Colorado law. (*Id*. 6-8 (citations omitted).)

The Colorado Court of Appeals recently succinctly explained the fundamental tenets of Colorado contract law, applicable here:

> The interpretation of a contract is a question of law for the court.  A court's duty is to interpret a contract in a manner that effectuates the manifest intention of the parties at the time the contract was signed.  The touchstone in determining the intention of the parties is the language of the written agreement.
> If the language is plain, clear, and unambiguous, a contract must be enforced as written.  In addition, the words and phrases in the contract should be interpreted, not in isolation, but by examination of the contract as a whole.  Finally, documents executed together as part of a single transaction should be considered together in ascertaining the intent of the parties.
> Courts possess no authority to rewrite contracts and must enforce unambiguous contracts in accordance with their terms.

*Randall & Black, Inc. v. Metro Wastewater Reclamation Dist.*, 77 P.3d 804, 806 (Colo. Ct. App. 2003) (internal quotation marks and citations omitted).  If a "contract is susceptible of more than one reasonable interpretation, it is ambiguous, and its meaning must be determined as an issue of fact." *Preserve at the Fort, Ltd. v. Prudential Huntoon Paige Assocs.*, 129 P.3d 1015, 1017-18 (Colo. Ct. App. 2004) ("whether a contract is ambiguous is a question of law").  Of course, a contract can be unambiguous in some regards, but ambiguous in others.  *See D.C. Concrete Mgmt., Inc. v. Mid-Century Ins. Co.*, 39 P.3d 1205, 1208 (Colo. Ct. App. 2001) (noting without comment, in its *de novo* review of the trial court's ambiguity determination, that the lower court "allowed extrinsic evidence *as to* who was the intended insured under the policy properly" (emphasis added)).

9

Further, it is well-established Colorado law that conditional admission of extrinsic evidence is proper "[i]n determining whether a contract is ambiguous":

> If, after considering such evidence, the court finds that the language of the contract unambiguously reflects the intentions of the parties, the court should disregard the extrinsic evidence and give effect to the language of the contract. If, however, the court finds the contract's terms to be ambiguous, the extrinsic evidence can serve as a useful starting point in determining the actual intentions of the parties.

*Id*. at 1207-08 (citations omitted); *see generally Lazy Dog Ranch v. Telluray Ranch Corp.*, 965 P.2d 1229 (Colo. 1998) (noting that "extrinsic evidence [may not] be used to contradict the language of the written instrument; rather, extrinsic evidence is used to explain and give context to the language" (construing a real property easement, but recognizing the application of contract principles in this context)).

The Panel's decision in the underlying arbitration comported with these strictures. First, as to whether, pursuant to the CDM, Cortez's tax-allowance distributions to its partners fall within the "7% valuation of Cortez property" limit, the Panel determined that the CDM allows tax-allowance distributions "*in addition* to the 7% [cap]."[7] (Stipulated Ex. 1 at 10.) Therein, the Panel did not expressly address whether the CDM is ambiguous on this point. Nor did it clarify whether it considered extrinsic evidence in reaching this determination. In any event, the Opinion makes no reference to extrinsic evidence in discussing the issue; the Panel exclusively referenced the contract

---

[7]As to whether the Settlement Agreement authorizes Cortez to distribute tax allowances to its partners, the Panel's April 24, 2006 Order found, "as a matter of law," that "the [Settlement] Agreement is *not ambiguous*" on this point. (Stipulated Ex. 3 at 2 (emphasis added); *see also id*. 1 ("Under controlling Colorado law, a contract is ambiguous 'when it is reasonably susceptible to more than one meaning.'").) The Panel concluded that it "clearly allows such distribution." (*Id*.) The Panel explained that the language in the Settlement Agreement's CDM "allow[s] Cortez to set tariffs to service debt *and* to provide a tax allowance." It also determined that the CDM "recogniz[es] that at least some distributions will be made to [Cortez's] partners." (*Id*. 3 (stating that a contrary interpretation would render "redundant" the CDM's language providing that "tariffs can also be set 'to provide a tax allowance'").)

10

language.[8]  (Stipulated Ex. 1 8-10; *see, e.g.*, *id.* 10 ("This sentence [of the CDM] makes clear that the cost of the tax allowance is in addition to the 7% and is not included herein.").)

The Panel "was not required" to articulate each analytical step in its reasoning. *Sheldon*, 269 F.3d at 1207. So long as "a ground for [the Panel's] decision . . . can be inferred from the facts of the case," the Award must be confirmed. *Id.* at 1207 n.6 (internal quotation marks and citation omitted); *see, e.g.*, *id.*(affirming an arbitration award confirmation, despite arbitrator's failure to "set forth the reasons for its dismissal [of a party's] claims").

Here, the Panel clearly indicated that the Panel found the Settlement Agreement unambiguous as to the tax allowances issue.  Further, its thorough analysis and discussion provides ample grounds for its conclusion that: (1) the CDM's language itself "makes clear" that the Settlement Agreement permits a "distribution of 7% *plus* tax allowances"; and (2) "[Petitioners] have not breached the Agreement" in computing the Cortez Tariff to "provide a return of both 7% of valuation and tax allowances" and in distributing these amounts.  (Stipulated Ex. 1 at 10.)

Second, as to whether "Cortez [could] use carry forwards in existence on the Cortez books at the time of the settlement in fixing tariffs to be applied after the settlement," the Panel determined that the Settlement Agreement allows these carry forwards to be included. (Stipulated Ex. 1 at 14, 16 (finding further that the Agreement "does not distinguish between the use of carry forwards created and existing before the settlement and carry forwards created after the settlement").)  In so

---

[8]As noted above, *supra* Part I, the *Atlantic Refining* Consent Decree is the rubric by which the Cortez Tariff was calculated *prior* to the Settlement Agreement.  It appears the Panel may have considered extrinsic evidence in rejecting Respondent's contention that the 7% limit proscribed by the *Atlantic Refining* Consent Decree "precludes Cortez from adding the tax allowances" thereto.  But this appears to be, in any event, irrelevant. (*E.g.*, Stipulated Ex. 1 at 8-9 (recognizing that the court that approved the Settlement Agreement "specifically found" that the Agreement did not "adopt the [*Atlantic Refining* Consent Decree] . . . wholesale" and that, pursuant to the Settlement Agreement, the Cortez Tariff is to be calculated as stated in the CDM).)

finding, the Panel did not make an express ambiguity determination. Nor did it squarely address whether it had considered extrinsic evidence related to the "carry forward" issue in interpreting the Agreement.

Notably, however, in a April 2006 pre-hearing order, the Panel ruled that: (1) the Settlement Agreement was *ambiguous* as to the carry forward issue (Stipulated Ex. 3-4 [April 24, 2006 Order] 3 (emphasis added)); and (2) at the June 2006 hearing, "all evidence relevant to the 'carry forward' issue, including extrinsic evidence concerning the mutual intent of the parties at the time of execution of the Agreement" would be conditionally admitted. (*Id*. 4.) The Panel underscored that it would "disregard such evidence in the event it determine[d], as the fact finder, that the Agreement is not ambiguous on that issue." (*Id*.)

To begin with, the Panel properly found that Colorado law permitted it to hear extrinsic evidence conditionally, regarding the parties' mutual intent related to the Settlement Agreement. *D.C. Concrete Mgmt., Inc.*, 39 P.3d at 1207-08. Respondent's arguments to the contrary are misplaced. (*E.g.*, Respondent's Resp. 13 ("On its face, this Panel's approach is a recipe for error.").)

Further, as explained above, vacatur is not justified by the fact that the Panel did not affirmatively address whether, after hearing the extrinsic evidence, it found the Agreement ambiguous on the carry forward issue. *See Sheldon*, 269 F.3d at 1207 n.6. Its numerous references to extrinsic evidence, strongly evidence the Panel concluded that: (1) the Settlement Agreement was ambiguous on this point; and (2) for that reason, it considered extrinsic evidence in resolving the parties' dispute. (*See* Stipulated Ex. 1 at 14-16.) Further, the Opinion's numerous references to extrinsic evidence, coupled with the Panel's inability to discern "what the parties intended" as to the carry forward issue prior to the hearing (Stipulated Ex. 3 at 3-4), make it highly unlikely that the Panel reversed course

12

*sub silentio* on the ambiguity issue.

In any event, vacatur is not appropriate. First, even if this Court found that the Panel's decision violated governing Colorado law, Respondent did not evidence any "willful inattentiveness to the governing law." *Bowen v. Amoco Pipeline Co.*, 254 F.3d 925, 932 (10th Cir. 2001) ("a finding of manifest disregard means the record will show the arbitrators knew the law and explicitly disregarded it" requires "more than error or misunderstanding of the law"); *ARW Exploration Corp. v. Aguirre*, 45 F.3d 1455, 1463 (10th Cir. 1995) (holding that "[m]anifest disregard for the law clearly means more than error or misunderstanding with respect to the law"), *cited in Sheldon*, 269 F.3d at 1207.

Second, and relatedly, the Court cannot say "with positive assurance that the contract is not susceptible" to the Panel's interpretation. *Sterling Colorado Beef Co. United Food & Commercial Workers, Local Union No. 7*, 767 F.2d 718, 720 (10th Cir. 1985), *cited with approval in Dominion Video Satellite, Inc.*, 430 F.3d at 1277; *Dominion Video Satellite, Inc.*, 430 F.3d at 1277 (rejecting an alleged ground for setting aside an arbitration award where "the arbitration panel was fully briefed" on the issue and decided against the appellant). The Settlement Agreement is clearly "susceptible" to the Panel's reasoned interpretation of both the tax-allowance distribution and the carry forward issues. (Stipulated Ex. 1 8-16.)

As such, Respondent's first ground for seeking vacatur is without merit.

> **b.     The Panel did not deny Respondent a "fundamentally fair" hearing in refusing to admit certain expert witness testimony proffered by Respondent.**

Respondent next argues that:

[t]he second error committed by the Panel relates to its refusal to allow the

13

> Committee to present evidence in opposition to Petitioners' carry forward theory and the appropriate amount of any such carry forward. The Panel refused to hear this evidence despite the fact that Petitioners, themselves, opened the door to this line of evidence. The Panel then compounded its error when it refused to allow the Committee to cross examine Petitioners' expert on the proper methodology for calculating carry forwards. Admission of the Committee's proferred [sic] evidence would have resulted in a profoundly different Award because the refused evidence would have made clear that the Petitioners' carry forward computation was overstated by approximately $65 million.

(Respondent's Resp. at 9.) Respondent claims that - by rejecting its proffered evidence regarding "the accuracy of [Petitioners'] $68 million carry forward figure" (i.e., the amount Petitioners contended, and the Panel concluded, of carry forward existing at the time of settlement) - the Panel erroneously concluded that there was no dispute" on this point. According to Respondent, this error led the Panel to "adopt[] Petitioners' $68 million unearned carry forward amount without affording the Committee an opportunity to contest it." (*Id*. 19.) On this basis, Respondent maintains that it was denied a "fundamentally fair hearing." (*Id*.)

Petitioners dispute Respondent's position. They counter that:

> [t]he Committee fails to inform the Court that the "rebuttal" evidence it proffered relating to the accuracy of the $68 million pre-settlement carry forward was in fact opinion testimony by its expert witness, Dr. Jerome Hass. The Committee further fails to inform the Court that the Panel excluded this expert opinion testimony, because the Committee had violated the prehearing Scheduling Order which – in lieu of allowing expert depositions – required all expert opinions, including rebuttal opinions, to be disclosed before the arbitration hearing.

(Petitioners' Reply 15.) Petitioners' position is well-taken.

Undoubtedly, the Panel was obligated to "grant the parties a fundamentally fair hearing." *Bowles Fin. Group, Inc. v. Stifel, Nicolaus & Co.*, 22 F.3d 1010, 1012 (10th Cir. 1994). But "a fundamentally fair hearing requires only notice, opportunity to be heard and to present relevant and material evidence and argument before the decision makers, and that the decisionmakers [sic] are not

14

infected with bias." *Id.* at 1013. Thus, setting aside the Award is only warranted if the Panel's exclusion of Respondent's proffered evidence challenging the accuracy of the $68 million carry forward figure deprived Respondent of a fundamentally fair hearing, or otherwise constituted arbitrator misconduct. The Panel's exclusion of the proffered testimony of Dr. Hass had neither effect.

The Scheduling and Procedure Order entered by the Panel governed, *inter alia*, discovery in the underlying arbitration proceeding. The Order established the following rules, and deadlines related to expert witnesses:

> There will also be a period for expert discovery, which will consist of the exchange of expert reports. [Respondent] shall disclose their expert reports. [Petitioners] then shall disclose their expert reports. [Deadline: May 3, 2006.] Plaintiffs may disclose rebuttal reports. [Deadline: May 24, 2006.] Defendants reserve the right to present evidence in response to any rebuttal report or opinion therein. [Deadline: May 31, 2006]. All opinions about which any expert will testify shall be contained in that expert's report. *Absent good cause, experts shall not be entitled to present opinions that are not so disclosed.* Unless and until subsequent order from the Panel states otherwise, there will be no expert depositions, as the reports are intended to be in lieu of them. In order to facilitate the schedule, the experts' work papers are to be exchanged along with their reports.

(Stipulated Ex. 2 at 4, 6 (emphasis added).) Thus, the Order obligated Respondent to, *inter alia*, disclose "[*a*]*ll* opinions about which" its experts were to testify in their respective expert reports, in any event, no later than May 31, 2006. (*See id.* at 4.) The Panel concluded that the Scheduling and Procedure Order's "unambiguous procedure for the prehearing disclosure of expert opinions" counseled against allowing the testimony. (*Compare* Stipulated Ex. 2 at 4 ("*All* opinions about which any expert will testify shall be contained in that expert's report. Absent good cause, experts shall not be entitled to present opinions that are not so disclosed."), *with* Petitioners' Ex. 7 at 715-17 ("[T]he parties were entitled to make discovery decisions and otherwise rely upon the assumption that

15

the order would be enforced.").)

The Panel heard extensive argument from counsel on, *inter alia*, whether Dr. Hass's opinion regarding the accuracy of the $68 million figure had been raised in his expert reports. Ultimately, the Panel ruled it had not. (Petitioners' Ex. 7 at 715; *id.* at 716 ("We consider the opinions that Dr. Hass is proposing to offer as being *entirely new* . . . ." (emphasis added).) After detailing its reasoning on the record at length (s*ee id.* at 712-25), the Panel excluded Respondent's proffered evidence, but expressly permitted Respondent to "challenge the accuracy of whether the $68 million qualified as 'underearned' under [the CDM], by cross-examination during [Petitioners'] case."[9] (*Id.* at 719.)

It is clear that the Panel afforded Respondent "notice" and an "opportunity to be heard." (*See id.* at 627-705 (argument on whether Dr. Hass would be permitted to testify to the accuracy of the $68 million figure).) And, while it did exclude evidence that Respondent maintains was "relevant and material," the Panel did so only after concluding doing so would be improper for a variety of reasons. *Bowles Fin. Group, Inc.*, 22 F.3d at 1013.

Specifically, the Panel found that: (1) it did not "believe that good cause has been shown by [Respondent] for relief from the obligations of the [S]cheduling and [P]rocedure [O]rder"; (2) Respondent's "decision not to question the number assigned to the carry forwards appears to have been a *strategic* one, and not . . . excusable neglect"; and (3) "[t]o allow Dr. Hass to offer these new opinions would, in our view, be *prejudicial* to the defendants and to the arbitration process." (Petioners' Ex. 7 at 716 (emphasis added).) The Panel further stated that it believed allowing

---

[9]Respondent claims that the Panel barred it from cross examining Petitioners' expert, Dr. Van Hoecke, regarding the accuracy of the $68 million figure. (Respondent's Resp. at 20-21.) They do so, however, without any specificity; no reference to the hearing transcript is made. The hearing transcript excerpts submitted to this Court do not evidence that the Panel barred Respondent from cross-examining Dr. Van Hoecke on this issue. To the contrary, the transcript excerpts evidence that the Panel reiterated its ruling - i.e., *allowing* such examination - at several points, over Petitioners' repeated objection. (*E.g.* Petitioners' Ex. 7 at 804.)

Respondent's proffered testimony "would inevitably result in a continuance of th[e] hearing," just the "added delay and added expense . . . . arbitration was designed to avoid." (*Id*. at 717.) The Panel's exclusion of Dr. Hass's opinion testimony at the hearing did not deprive Respondent of a fundamentally fair hearing. *See, e.g.*, *Bad Ass Coffee Co. of Hawaii v. Bad Ass Coffee Ltd. P'ship*, 25 F. A'ppx 738, 743 (10th Cir. 2001) (citing 9 U.S.C. § 10(a)(3)) ("BACLP has failed to show that the arbitrator's refusal to consider the proffered evidence constituted misconduct on the part of the arbitrator or deprived it of a fundamentally fair hearing."); *Spine Surgery, Inc. ex rel. Odor v. Sands Bros., Inc.*, 393 F. Supp. 2d 1138, 1143 (W.D. Okla. 2005) ("Not all failures to receive relevant evidence constitute misconduct, requiring a court to vacate an arbitration award."); *B-S Steel of Kansas, Inc. v. Texas Indus., Inc.*, 321 F. Supp. 2d 1214, 1219-20 (D. Kan. 2004) ("Far from working an injustice upon B-S Steel, the arbitrators' admission of Exhibit 570, in violation of clearly established deadlines, would have worked an injustice upon Midlothian."). *Cf. Gust v. Jones*, 162 F.3d 587, 592 (10th Cir. 1998) (reviewing district court's evidentiary ruling for abuse of discretion and affirming where defendant "failed to comply with the court's [discovery] orders and [Fed. R. Civ. P] 26 " in that the expert's report did not express an opinion on the issue in question); Fed. R. Civ. P. 26 (mandating that "'[A] written report [be] prepared and signed by the [previously-designated expert] witness. The report shall contain a complete statement of *all opinions to be expressed* and the basis and reasons therefore." (emphasis added)).

Hence, the Panel did not deny Respondent a fundamentally fair hearing in excluding its proffered evidence under these circumstances. As such, Respondent's second basis for vacatur does not warrant setting aside the Arbitration Award. *See Hollern*, 458 F.3d at 1172 ("[T]he finality of arbitration weighs heavily in its favor and cannot be upset except under exceptional circumstances."

17

(internal quotation marks and citation omitted.)); *see generally LB &B Assoc. v. Int'l Bhd. of Elec. Workers, Local No. 113*, 461 F.3d 1195, 1200 ("the parties have bargained for the arbitrator, not the courts, to decide their dispute").

**IV.  Conclusion.**

For all the forgoing reasons, Petitioners' Applications (Docs. 1, 21) are **granted**; the underlying August 7, 2006 Arbitration Award issued by the Panel is hereby **confirmed**.

**IT IS SO ORDERED**.

_____
**ROBERT C. BRACK
UNITED STATES DISTRICT JUDGE**